FILED

2025 Jan-27  AM 09:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION



ZACHARY WARD,       }

    Plaintiff,     }
              }

v.                 }
              }

CAROLYN W. COLVIN, Acting  }    **CASE NO.:  6:23-cv-01556-MHH**
Commissioner of Social Security,[1]  }
              }

              }

      Defendant.  }

## <u>MEMORANDUM OPINION</u>

Zachary Ward has asked the Court to review a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Mr. Ward's claim for supplemental security income based on an Administrative Law Judge's finding that Mr. Ward was not disabled.  Mr. Ward challenges the finding.  This opinion resolves his appeal.

---

[1]  On November 30, 2024, Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Commissioner Colvin as the defendant in this action.  *See* Fed. R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds officer, the "court may order substitution at any time. . . .").

# ADMINISTRATIVE PROCEEDINGS

To succeed in his administrative proceedings, Mr. Ward had to prove that he was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[2]

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v.*

---

[2] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." *See* https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited Dec. 2, 2024).

*Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009).  "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy."  *Wright*, 327 Fed. Appx. at 137.

Mr. Ward applied for supplemental security income benefits on March 19, 2020.  (Doc. 7-7, p. 5).  He alleged that his disability began on May 20, 2016.  (Doc. 7-7, p. 5).[3]  The Social Security Commissioner denied Mr. Ward's claim, and Mr. Ward requested a hearing before an ALJ.  (Doc. 7-4, pp. 17-18; Doc. 7-6, pp. 91-94).  Mr. Ward and his attorney attended a hearing via telephone on November 1, 2021.  (Doc. 7-3, p. 61).  A vocational expert testified at the hearing.  (Doc. 7-3, pp. 54, 82-85).[4]

On November 22, 2021, the ALJ issued an unfavorable decision.  (Doc. 7-4, pp. 40-52).  On June 21, 2022, the Appeals Council vacated the ALJ's decision and remanded the case because the ALJ did not address Dr. Terry Bentley's March 18, 2021 opinion that Mr. Ward "could not reasonably be expected to be reliable in attending an eight hour work day, 40 hour work week, week after week, in view of

---

[3]  A claimant becomes eligible for SSI benefits in the first month in which he is "both disabled and has an SSI application on file."  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); *see also* 20 C.F.R. §§ 416.330, 416.335 (2023).  For his SSI claim, Mr. Ward had to prove that he was disabled between the application date of March 19, 2020 through the ALJ's decision on April 10, 2023.  *Moore*, 405 F.3d at 1211.

[4]  Mr. Ward and his attorney appeared in person at the Social Security Administration office in Birmingham, Alabama.  The ALJ and vocational expert participated in the hearing via telephone. (Doc. 7-3, p. 61).

his impairments, and that [Mr. Ward] ha[d] a poor ability to perform activities of daily living, concentrate, persist and maintain pace, adapt to stressful work like settings, behave in an emotionally stable manner, relate predictably in social situations, deal with the public, and maintain personal appearance." (Doc. 7-4, p. 59). The Appeals Council directed the ALJ to evaluate Dr. Bentley's opinion and to "[g]ive further consideration to [Mr. Ward's] maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations." (Doc. 7-4, p. 59). The Appeals Council noted that the ALJ could ask Dr. Bentley to "provide additional evidence and/or further clarification of [his] opinion." (Doc. 7-4, p. 59).

On February 13, 2023, Mr. Ward and his attorney attended a second administrative hearing via telephone. (Doc. 7-3, pp. 38-58). A different vocational expert testified at the hearing. (Doc. 7-3, pp. 52-58). On April 5, 2023, the ALJ issued an unfavorable decision. (Doc. 7-3, pp. 18-29). On September 22, 2023, the Appeals Council declined Mr. Ward's request for review, (Doc. 7-3, pp. 2-4), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Mr. Ward's Medical Records*

Mr. Ward placed in the administrative record medical records that relate to the diagnosis and treatment of bipolar disorder, major depression, anxiety, sleep issues, knee and back pain, and migraines. The Court has reviewed Mr. Ward's medical records and summarizes the following records because they are most relevant to Mr. Ward's arguments in this appeal.

On September 6, 2017, Mr. Ward saw Dr. John Bivona and CRNP Jane Eggenberger at Jasper Family Practice. Mr. Ward reported that he had difficulty concentrating. (Doc. 7-9, pp. 84, 85, 87).[5] Mr. Ward noted that he took Adderall as a child, and he asked to discuss medications. (Doc. 7-9, pp. 84, 85). At the appointment, Mr. Ward was casually dressed, alert and oriented, and cooperative; he had good eye contact and coherent speech. (Doc. 7-9, p. 85). CRNP Eggenberger noted "[a]ttention and concentration deficit." (Doc. 7-9, p. 86). CRNP Eggenberger instructed Mr. Ward to take his ADD medication as directed. (Doc. 7-9, p. 87).[6]

---

[5] For Mr. Ward's visits with CRNP Eggenberger and Dr. Bivona, CRNP Eggenberger signed the medical records and indicated that she and Dr. Bivona saw Mr. Ward. (*See* Doc. 7-9, pp. 99, 100). Where CRNP Eggenberger signed the records, the Court will reference CRNP Eggenberger for these visits. Otherwise, the Court will reference Dr. Bivona.

[6] The medication list for this visit included an allergy medication and vitamin D2, but Mr. Ward did not have an ADD prescription. (Doc. 7-9, p. 84).

Mr. Ward saw Dr. Bivona and CRNP Eggenberger on October 30, 2017, complained of mild difficulty concentrating, and asked to discuss his medication. (Doc. 7-9, pp. 98-100).  CRNP Eggenberger diagnosed Mr. Ward with attention deficit hyperactivity disorder with "predom[inate] inattentive type" and prescribed 30mg of Vyvanse.  (Doc. 7-9, p. 100).[7]  At an April 23, 2019 appointment at Jasper Family Practice, Mr. Ward complained of ADHD and difficulty concentrating at work.  (Doc. 7-9, p. 101).[8]  Mr. Ward reported that he was "more depressed," complied with his medication instructions, and had trouble losing weight.  (Doc. 7-9, p. 101).  Mr. Ward weighed 504 pounds.  (Doc. 7-9, p. 101).  Mr. Ward was "positive for depression" and had "some occasional" suicidal ideation.  (Doc. 7-9, p. 101).  Mr. Ward was clean and casually dressed; had an appropriate effect; was alert and oriented to person, place, and situation; and had coherent speech.  (Doc. 7-9, p. 102).  Mr. Ward had a normal gait and moved "all extremities well."  (Doc. 7-9, p. 102).

---

[7] Vyvanse is a central nervous system stimulant used for the treatment of ADHD. *See* https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/208510lbl.pdf (last visited Aug. 5, 2024).

[8]  The Court cannot locate records for medical visits for Mr. Ward between October 2017 and April 2019.

The medical records for this visit appear to be missing pages and do not indicate the treatment provider at Jasper Family Practice.

At a May 1, 2019 visit with Dr. Bivona and CRNP Eggenberger, Mr. Ward complained that his ADHD caused mild difficulty concentrating at work. (Doc. 7-9, p. 115). Mr. Ward weighed 507 pounds. (Doc. 7-9, p. 115). Mr. Ward had prescriptions for Wellbutrin and other medications. (Doc. 7-9, p. 115).[9] CRNP Eggenberger diagnosed major depressive disorder, single episode; attention and concentration deficit; attention deficit hyperactivity disorder, predominately inattentive; other malaise; testicular hypofunction; and obesity, among other diagnoses. (Doc. 7-9, p. 116). CRNP Eggenberger gave Mr. Ward a testosterone injection, continued Wellbutrin, and advised Mr. Ward to "limit stress." (Doc. 7-9, pp. 116-17).

Mr. Ward complained of mild difficulty concentrating at work and fatigue during visits with Dr. Bivona and CRNP Eggenberger on August 7 and November 5, 2019. (Doc. 7-9, pp. 124-26, 127-29).[10] Dr. Bivona noted on August 7, 2019 that Mr. Ward had seen Dr. McCool for "severely low" testosterone levels and that Dr. McCool "recommended repletion." (Doc. 7-9, p. 124; *see* Doc. 7-9, pp. 143-46).

---

[9] Wellbutrin is used for the treatment of depression associated with bipolar disorder, obesity, and ADHD. *See* https://www.ncbi.nlm.nih.gov/books/NBK470212/ (last visited Dec. 3, 2024).

[10] Dr. Bivona signed the August 7, 2019 records, (Doc. 7-9, p. 126), and CRNP Eggenberger signed the November 5, 2019 records, (Doc. 7-9, p. 129).

Dr. Bivona noted Mr. Ward's history of hypogonadism.  (Doc. 7-9, p. 124).[11]  Mr. Ward received testosterone injections at both visits.  (Doc. 7-9, pp. 126, 129).  Dr. Bivona and CRNP Eggenberger advised Mr. Ward to limit stress and to take Wellbutrin as prescribed.  (Doc. 7-9, pp. 126, 129).

On February 19, 2020, Mr. Ward saw Dr. Paola Tumminello at Walker Neurology.  Mr. Ward explained that he had migraine headaches "two times per week," and his migraines began when he was 13 years old.  (Doc. 7-10, p. 61).  Mr. Ward reported that the headaches made him feel like he was "hit by a baseball bat," caused blurry vision, lasted between three to four hours, and occasionally caused nose bleeds.  (Doc. 7-10, p. 61).

Dr. Tumminello noted that Mr. Ward was alert and oriented and had intact concentration, 5/5 muscle strength in his arms and legs, intact sensation and coordination, and a normal gait.  (Doc. 7-10, pp. 62-63).  Mr. Ward weighed 506 pounds.  (Doc. 7-10, pp. 61, 69).  Dr. Tumminello's impressions included migraine headaches, morbid obesity, anxiety, and depression.  (Doc. 7-10, p. 61).  Dr. Tumminello indicated that Mr. Ward needed a sleep study because "obstructive sleep apnea [could] contribute to severe headaches."  (Doc. 7-10, p. 61).  Dr.

---

[11] "Male hypogonadism is a condition in which the body doesn't produce enough of the hormone that plays a key role in masculine growth and development during puberty (testosterone) or enough sperm or both. . . "[S]ymptoms might include[] . . . decreased energy [and] depression.  *See* https://www.mayoclinic.org/diseases-conditions/male-hypogonadism/symptoms-causes/syc-20354881 (last visited Dec. 3, 2024).

Tumminello prescribed Topamax 50mg for Mr. Ward's migraines and ordered an MRI.  (Doc. 7-10, p. 61).  The May 4, 2020 MRI of Mr. Ward's brain showed "[c]erebellar tonsillar ectopia with some flattening of the pituitary" that could be "associated with Chiari 1 malformation" and "significant adipose tissue in the head and neck region" that "raise[d] the question of possible idiopathic intracranial hypertension."  (Doc. 7-11, p. 48).[12]  Dr. Tumminello referred Mr. Ward to a psychiatrist for his depression.  (Doc. 7-10, p. 61).

On February 24, 2020, Mr. Ward saw Dr. Terry Bentley at Northwest Alabama Psychiatric Services. (Doc. 7-11, p. 69).  Mr. Ward stated that he had experienced depression for seven to eight years that had become "worse [and] worse."  (Doc. 7-11, p. 69).  Mr. Ward indicated that he felt guilty that he lived in an apartment behind his parents' home and relied on his parents to function.  (Doc. 7-11, p. 69).  He stated that he had no friends, participated in live action role playing as a teenager, and played video games.  (Doc. 7-11, p. 70).  Mr. Ward reported very low energy and poor concentration.  (Doc. 7-11, p. 69).  Mr. Ward stated he could not work because he angered easily, was "very irritable," and could not "interact socially."  (Doc. 7-11, p. 69).  Mr. Ward reported that he sometimes heard voices,

---

[12]  A Chiari malformation "is a condition in which brain tissue extends into the spinal canal.  It occurs when part of the skull is misshapen or smaller than is typical. The skull presses on the brain and forces it downward . . .  Bad headaches are the classic symptom of Chiari malformation."  *See* https://www.mayoclinic.org/diseases-conditions/chiari-malformation/symptoms-causes/syc-20354010 (last visited Dec. 4, 2024).

felt like he was being followed, had high anxiety especially in crowds, and had suicidal ideations. (Doc. 7-11, p. 69). Dr. Bentley noted that Mr. Ward had attempted suicide twice. (Doc. 7-11, p. 69). Mr. Ward rated the following findings as severe: was depressed most of the day; felt worthless or inappropriate guilt; was distracted; feared losing control, going crazy or dying; feared places, things, or people and not being able to escape them; had recurrent and persistent thoughts, impulses, or images causing marked distress; had repetitive behaviors, such as checking locks; had random delusions and hallucinations; and worried. (Doc. 7-11, p. 72). Dr. Bentley noted that Mr. Ward had been treated for ADD as a child with Ritalin and was taking Vyvanse. (Doc. 7-11, p. 70).

Dr. Bentley noted that Mr. Ward was moderately anxious and fearful and had severe depression and feelings of guilt. (Doc. 7-11, p. 73). Mr. Ward was alert to time, place, and person and had satisfactory attention span, adequate insight, logical thoughts, undisturbed memory, and precise speech. (Doc. 7-11, p. 73). Mr. Ward reported that he had auditory hallucinations and "[s]uicidal / [h]omicidal" ideation but no plans or intent to harm himself or others. (Doc. 7-11, pp. 73-74). Dr. Bentley's diagnoses included severe major depression, obsessive compulsive disorder, ADD, generalized anxiety disorder, panic disorder, and morbid obesity. (Doc. 7-11, p. 74). Dr. Bentley prescribed Zoloft to treat Mr. Ward's depression and anxiety. (Doc. 7-11, p. 74).

On Dr. Bivona's referral, on March 4, 2020, Mr. Ward saw Dr. Jan Westerman at Pulmonary and Sleep Associates. (Doc. 7-9, p. 9). According to the narrative portion of the record for this appointment, Mr. Ward reported that he had trouble sleeping, snored, woke gasping for air, and had daily headaches occasional nose bleeds at night. (Doc. 7-9, p. 9).[13] Mr. Wade reported daytime sleepiness, sleep paralysis, and "possible episodes of cataplexy." (Doc. 7-9, p. 9). Dr. Westerman noted that Mr. Ward was morbidly obese at 505 pounds. (Doc. 7-9, p 11). Mr. Ward did not have joint tenderness; had 4/4 muscle strength, normal muscle tone, intact sensation, and a normal gait; and had an "intact mini mental status exam," normal mood, and appropriate affect. (Doc. 7-9, p. 11). Dr. Westerman's diagnoses included anxiety; cataplexy due to chronic sleep deprivation; and daily headaches, nocturia, and sleep paralysis because of possible obstructive sleep apnea. (Doc. 7-9, p. 12). Dr. Westman recommended a sleep study. (Doc. 7-9, p. 12).

Mr. Ward saw Dr. Bentley on March 9, 2020 and reported that "things had not changed much," that his medications "[might] be helping," that he felt less dread, and that he "wanted to get out and do things." (Doc. 7-11, p. 75). Mr. Ward stated that he did not get jobs for which he applied. (Doc. 7-11, p. 75). He indicated that he no longer talked to a close friend but was "happier" not talking to him. (Doc. 7-

---

[13] According to the "Review of systems" section of the record of this appointment, Mr. Ward denied headaches and snoring. (Doc. 7-9, p. 10).

11, p. 75).  Dr. Bentley noted that Mr. Ward was neatly dressed, coherent, and cooperative; made good eye-contact; had a "little better" mood; had good insight and judgment; and did not have hallucinations, paranoia, or suicidal ideations. (Doc. 7-11, p. 75).  Dr. Bentley continued Mr. Ward's 100 mg Zoloft prescription.  (Doc. 7-11, p. 75).  At a March 23, 2020 visit, Mr. Ward stated that his parents were moody and "on him constantly," that he felt like the things he did were "worthless," and that he was "never going to be good enough" for his parents.  (Doc. 7-11, p. 76).  He reported that his friend was "bothering him a great deal" and wanted to play games all day, but Mr. Ward stated that he could not "go back to that."  (Doc. 7-11, p. 76). Mr. Ward indicated that he was "turned down for HVAC jobs due to his weight." (Doc. 7-11, p. 76).  Dr. Bentley noted that Mr. Ward had a flat affect and down mood but good insight and judgment.  (Doc. 7-11, p. 76).  Dr. Bentley increased the Zoloft prescription to 150 mg and encouraged Mr. Ward to see a bariatric specialist for weight loss.  (Doc. 7-11, p. 76).[14]

At an April 6, 2020 visit with Dr. Bentley, Mr. Ward stated that he felt "pretty good," that he believed his medication helped, and that he felt like getting up and out of the house.  (Doc. 7-11, p. 77).  He reported standing up to and getting angry at his "bossy" grandmother.  (Doc. 7-11, p. 77).  Dr. Bentley noted that Mr. Ward

---

[14] In both records, Dr. Bentley also noted Mr. Ward's testosterone treatment.  (Doc. 7-11, pp. 75-76).

had a brighter affect and better mood.  (Doc. 7-11, p. 77).  At a May 5, 2020 visit, Mr. Ward reported that he was "not doing too bad" and tried to stay to himself and "stay quiet."  (Doc. 7-11, p. 78).  He indicated that he had better days than before and that apart from family issues, he was improving.  (Doc. 7-11, p. 78).

When he saw Dr. Bentley on June 4, 2020, Mr. Ward stated that he had been arguing with his mother and grandmother and was keeping his distance from his family because of "stress and arguments."  (Doc. 7-11, p. 79).  He indicated that his mood was "okay" and better after the increase in his Zoloft dosage.  (Doc. 7-11, p. 79).  Mr. Ward complained of low energy that likely was associated with his inability to get his testosterone injections because of the COVID-19 pandemic.  (Doc. 7-11, p. 79).  Dr. Bentley noted that Mr. Ward had a constricted affect, anxious mood, and good insight and judgment.  (Doc. 7-11, p. 79).  Dr. Bentley increased Mr. Ward's Zoloft prescription to 200mg.  (Doc. 7-11, p. 79).

On June 8, 2020, on Dr. Tumminello's referral, Mr. Ward saw Dr. R.J. Johnson at Haynes Neurosurgical Group for evaluation of his migraines.  (Doc. 7-9, p. 147).  Mr. Ward reported that he still had headaches, but the severity and frequency of his headaches had diminished on Topamax.  (Doc. 7-9, p. 148).  Mr. Ward reported fatigue; headaches; dizziness; numbness or tingling sensation; shortness of breath when walking; joint, muscle, and back pain; nervousness; depression; and excessive thirst, heat, and cold intolerance.  (Doc. 7-9, p. 147).  Dr.

Johnson noted the Chiari malformation from Mr. Ward's May 2020 MRI, indicated that the malformation did not contribute to Mr. Ward's headaches, and stated that Mr. Ward's weight played "a role in his symptoms." (Doc. 7-9, p. 148). Mr. Ward appeared comfortable, had no motor deficits, could "heal and toe stand easily," and had normal reflexes. (Doc. 7-9, p. 148). Dr. Johnson recommended that Mr. Ward obtain another brain MRI in a year and continue migraine treatment with Dr. Tumminello. (Doc. 7-9, p. 148).

On July 1, 2020, Mr. Ward saw Dr. Bentley and stated that he was frustrated because of "family issues." (Doc. 7-11, p. 80). He considered moving but had no viable options. (Doc. 7-11, p. 80). Mr. Ward stated that he was "scared to say anything" about the family issues because he wanted to avoid conflict. (Doc. 7-11, p. 80). Mr. Ward reported headaches. (Doc. 7-11, p. 80). Dr. Bentley noted that Mr. Ward had a cooperative demeanor, constricted affect, frustrated mood, and good insight and judgment. (Doc. 7-11, p. 80). Dr. Bentley continued Mr. Ward on 200 mg of Zoloft and added a prescription for 10 mg of Buspar. (Doc. 7-11, p. 80).[15] At a July 29, 2020 visit, Mr. Ward stated that he was doing the best he could and that his depression was worse, and his anxiety was "getting out of control." (Doc. 7-12, p. 40). He reported suicidal ideations "that he was able to get past," and he stated

---

[15] Buspar is used to treat anxiety and mood disorders. *See* https://my.clevelandclinic.org/health/drugs/20084-buspirone-tablets (last visited Dec. 5, 2024).

that he had difficulty going out in public because he felt that people were watching and judging him. (Doc. 7-12, p. 40). Dr. Bentley increased Mr. Ward's Buspar prescription to 30mg and prescribed 1.5 mg of Vraylar. (Doc. 7-12, p. 40).[16]

At an August 2, 2020 visit with Dr. Bentley, Mr. Ward reported that he had a "mental breakdown" because things were "too much to handle" and that he screamed, cried, and punched a wall. (Doc. 7-12, p. 41). He stated that he had suicidal ideations "with [the] outburst" and indicated that he would not be "strong enough next time." (Doc. 7-12, p. 41). He reported problems sleeping while on Vraylar. (Doc. 7-12, p. 41). Dr. Bentley increased Mr. Ward's Vraylar prescription to 3mg and prescribed Lamictal. (Doc. 7-12, p. 41).[17] At an August 11, 2020 visit, Mr. Ward reported that he was "a little better," had fewer anger outbursts, and was less irritable. (Doc. 7-12, p. 42). Dr. Bentley advised Mr. Ward to continue taking his medication as prescribed. (Doc. 7-12, p. 41).

In September 2020, Mr. Ward reported being in a "depressed rut" and angry because his online friends were "pushing him to do things he [did] not have the money to do." (Doc. 7-12, p. 44). At an October 2020 visit, Mr. Ward reported that

---

[16] Vraylar is used to treat schizophrenia and bipolar disorder. *See* https://my.clevelandclinic.org/health/drugs/20257-cariprazine-capsules (last visited Dec. 5, 2024).

[17] Lamictal is used for "maintenance treatment of bipolar I disorder to delay the time to occurrence of mood episodes (depression, mania, hypomania, mixed episodes) in patients treated for acute mood episodes with standard therapy." *See* https://reference.medscape.com/drug/lamictal-lamotrigine-343012 (last visited Dec. 5, 2024).

he felt stressed because his truck broke, he had no money to fix it, and his family was placing more demands on him. (Doc. 7-12, p. 45). He had a few "bad days," was easily frustrated, and had a couple of crying spells. (Doc. 7-12, p. 45). Dr. Bentley discontinued Vraylar and prescribed Abilify. (Doc. 7-12, p. 45).[18] In November 2020, Mr. Ward reported doing "okay" but stated that he had a couple of days of "unmotivated crying," anger outbursts, and screaming. (Doc. 7-12, p. 50). Dr. Bentley noted that Mr. Ward had a constricted affect and "fairly good" mood. (Doc. 7-12, p. 50). At a December 2020 visit, Mr. Ward reported that his mood was better, that the Lamictal "helped control his anger and impulsivity," that he did not sleep well, and that he had some anger and crying spells. (Doc. 7-12, p. 51). Dr. Bentley increased the Abilify prescription to 15 mg and prescribed Vistaril. (Doc. 7-12, p. 51).[19]

At a January 5, 2021 visit with Dr. Bentley, Mr. Ward reported being in a "bad rut." (Doc. 7-12, p. 52). He struggled with "doing tasks around the house jumping from one thing to another," had anxiety from hyper-focusing on situations, and was easily agitated. (Doc. 7-12, p. 52). Mr. Ward stated that Vistaril helped his anxiety

---

[18] Abilify "is used alone or together with other medicines to treat mental conditions such as bipolar I disorder (manic-depressive illness), major depressive disorder, and schizophrenia. *See* https://www.mayoclinic.org/drugs-supplements/aripiprazole-oral-route/description/drg-20066890 (last visited Dec. 5, 2024).

[19] Vistaril "is used to help control anxiety and tension caused by nervous and emotional conditions." *See* https://www.mayoclinic.org/drugs-supplements/hydroxyzine-oral-route/description/drg-20311434 (last visited Dec. 5, 2024).

a little.  (Doc. 7-12, p. 52).  He indicated that playing video games "calm[ed] his nerves."  (Doc. 7-12, p. 52).  He reported that his family was "not supportive."  (Doc. 7-12 p. 52).  Dr. Bentley continued Mr. Ward on Zoloft, Buspar, Lamictal, Abilify, and Vistaril and added a prescription for 10 mg of Ritalin.  (Doc. 7-12, p. 52).

On February 1, 2021, Mr. Ward reported that he was "doing better" but stated that he had a breakdown and withdrew for several days after he slipped and fell.  (Doc. 7-12, p. 53).  Dr. Bentley noted that Mr. Ward had a "disheveled" appearance, broad affect, and "okay" mood.  (Doc. 7-12, p. 53).  At a March 1, 2021 visit, Mr. Ward reported that he had had "[r]ough days [the] past couple of weeks," had anger outbursts, and was hyper-focused on things to the "point he [could not] get rid of it."  (Doc. 7-15, p. 3).  Dr. Bentley increased Mr. Ward's Ritalin dosage to 20 mg.  (Doc. 7-15, p. 3).  On March 15, 2021, Mr. Ward reported that he had had some good days and some days with anger outbursts that triggered depression.  (Doc. 7-15, p. 4).  He stated that he walked, got physically active, and played video games to calm down.  (Doc. 7-15, p. 4).  Dr. Bentley noted that Abilify helped reduce Mr. Ward's "temper outbursts."  (Doc. 7-15, p. 4).

On March 18, 2021, Dr. Bentley completed a medical source statement regarding Mr. Ward's mental impairments.  (Doc. 7-15, p. 5).  Dr. Bentley's diagnoses included bipolar disorder, generalized anxiety disorder, panic disorder, and attention deficit disorder.  (Doc. 7-15, p. 5).  Mr. Ward's medications included

Zoloft, Lamictal, Vistaril, Buspar, and Ritalin. (Doc. 7-15, p. 7). Dr. Bentley assessed as "poor" Mr. Ward's ability to perform his activities of daily living without supervision or instruction; concentrate, persist, and maintain pace; adapt to stressful circumstances in a work setting without deterioration or decompensation; understand, remember, and carry out complex instructions; behave in an emotionally stable manner; relate predictably in social settings; deal with the public; maintain personal appearance; deal with the stress of ordinary work; demonstrate reliability; persist at assigned tasks, and timely complete tasks commonly found in work settings. (Doc. 7-15, pp. 6-7). Dr. Bentley rated as "fair" Mr. Ward's ability to interact appropriately, communicate effectively, and engage in other aspects of social functioning; understand, remember, and carry out detailed, but not complex instructions; follow work rules; relate to his peers, co-workers, and supervisors; work at a consistent pace for acceptable periods of time; use judgment; maintain attention; and be aware of hazards. (Doc. 7-15, pp. 6-7). Dr. Bentley rated Mr. Ward's ability to understand and carry out simple instructions as "good." (Doc. 7-17, p. 6). Dr. Bentley noted that Mr. Ward had "difficulty functioning in a stressful environment." (Doc. 7-17, p. 7).

At an April 15, 2021 visit with Dr. Bentley, Mr. Ward reported irritability, anxiety, self-isolation, and stress with social interactions. (Doc. 7-15, p. 10). Mr. Ward had poor sleep, a flat affect, an euthymic mood, rational thought processes,

good attention span and concentration, and no suicidal ideation. (Doc. 7-15, p. 9). Dr. Bentley added Abilify in the morning to help Mr. Ward's mood. (Doc. 7-15, p. 9). On May 12, 2021, Mr. Ward reported that he was "not as depressed," that his anger was more manageable, that he had not had a panic attack since his previous visit, and that he had two manic episodes that involved irritability, anger outbursts, and punching a wall. (Doc. 7-15, pp. 11-12). He had good sleep, good energy, and normal mental status examination results. (Doc. 7-15, p. 11). Dr. Bentley increased the Abilify dosage to 30 mg. (Doc. 7-15, p. 11).

At a June 14, 2021 visit, Mr. Ward reported disruptive anger outbursts, agitation, and anxiety. (Doc. 7-15, pp. 13-14). Dr. Bentley assessed Mr. Ward's bipolar disorder as "moderate to severe." (Doc. 7-15, p. 14). Dr. Bentley discontinued Buspar and Vistaril and prescribed Ativan and Wellbutrin. (Doc. 7-15, p. 13). On June 29, 2021, Dr. Bentley noted that Mr. Ward was responding well to his medication adjustments, had better control over his anger outbursts, felt a "little better," and had occasional panic attacks. (Doc. 7-15, pp. 15-16). Dr. Bentley noted that Mr. Wade had not been evaluated for sleep apnea. (Doc. 7-15, p. 16).

At a July 13, 2021 visit with Dr. Bentley, Mr. Ward reported "a lot of issues with his mood," irritability, poor sleep, and poor energy. (Doc. 7-15, p. 17). Dr. Bentley noted that Mr. Ward was "gaining insight into his dynamics with his online friends." (Doc. 7-15, p. 18). Dr. Bentley increased the Wellbutrin dosage to 300

mg, adjusted the time for taking Ativan, and continued Mr. Ward on his other medications. (Doc. 7-15, p. 17). On August 12, 2021, Mr. Ward stated that he did not "know what [he was] doing anymore" and that he "wish[ed] [he] had somewhere to go to get away." (Doc. 7-15, p. 19). He had an anxious and irritable mood and racing thoughts. (Doc. 7-15, p. 19). Dr. Bentley discontinued Abilify and prescribed 60 mg of Geodon. (Doc. 7-15, p. 19).[20] On September 14, 2021, Mr. Ward indicated that he could not tolerate Geodon because it exacerbated his migraines. (Doc. 7-15, pp. 21-22). Dr. Bentley discontinued Geodon and prescribed Risperdal. (Doc. 7-15, p. 21).[21] On October 14, 2021, Mr. Ward saw Dr. Bentley and stated that his mood was "halfway decent," he felt overwhelmed, he wanted to get a sleep apnea evaluation, and he was getting along with everyone. (Doc. 7-17, p. 4).

On October 19, 2021, Mr. Ward saw CRNP Alelsha Uptain at Pulmonary and Sleep Associates of Jasper and indicated that he needed a sleep study. (Doc. 7-16, p. 16). Mr. Ward reported that he snored and had muscle weakness, joint and back pain, anxiety, depression, and difficulty sleeping. (Doc. 7-16, p. 17). Mr. Ward had a normal gait, 4/4 muscle strength, normal muscle tone, normal mood, an appropriate

---

[20] Geodon "is used to treat symptoms of psychotic (mental) disorders, such as schizophrenia, mania, or bipolar disorder." *See* https://www.mayoclinic.org/drugs-supplements/ziprasidone-oral-route/description/drg-20067144 (last visited Dec. 5, 2024).

[21] Risperdal     is     used     to     treat     bipolar     disorder.     *See* https://my.clevelandclinic.org/health/drugs/20391-risperidone-tablets (last visited August 7, 2024).

affect, and an "intact mini mental status exam." (Doc. 7-16, p. 18). CRNP Uptain noted that they had recommended a sleep study a year earlier, but Mr. Ward did not schedule a study "due to insurance." (Doc. 7-16, pp. 16, 19).

At a November 10, 2021 visit with Dr. Bentley, Mr. Ward indicated that he had had his disability hearing, that he was not as angry, and that he tried to avoid stressful situations. (Doc. 7-17, pp. 5-6). On December 8, 2021, Mr. Ward reported that he was "doing fairly well" but had a couple of "rough days." (Doc. 7-17, p. 7). He had suicidal ideations with no plan or intent, and his friends helped him get through his suicidal thoughts. (Doc. 7-17, pp. 7-8).

On January 10, 2022, Mr. Ward saw CRNP Jane Herald at Jasper Family Practice and complained of moderate fatigue, depression, and lower back and left knee pain. (Doc. 7-16, pp. 6, 7). Mr. Ward weighed 505 pounds. (Doc. 7-16, p. 6). Mr. Ward's medications included Risperdal, Cymbalta, Lamictal, Ritalin, Vistaril, and Zoloft. (Doc. 7-16, p. 6). CRNP Herald noted that Mr. Ward was alert and oriented, clean and casually dressed, and cooperative. (Doc. 7-16, p. 7). Mr. Ward did not have swelling, had crepitus in his left knee, and had a normal gait. (Doc. 7-16, p. 7). An x-ray of Mr. Ward's thoracic spine showed "[e]vidence of [d]egenerative changes," and x-rays of his left knee showed "[n]o acute changes" and "[n]o significant degenerative change." (Doc. 7-16, pp. 8, 23). CRNP Herald could not obtain an x-ray of Mr. Ward's "lspine due to weight requirements." (Doc.

7-16, p. 8).  CRNP Herald advised Mr. Ward to rest and apply heat to his back, and she prescribed a steroid taper and Flexeril.  (Doc. 7-16, p. 9).  At a January 24, 2022 telemedicine visit, Mr. Ward reported no improvement in his back.  CRNP Herald ordered an MRI of Mr. Ward's lumbar spine.  (Doc. 7-16, p. 11).[22]

On January 5, 2022, Mr. Ward saw Dr. Bentley and reported that "[t]hings ha[d] gone down," that he had suicidal ideation, and that he was avoiding people. (Doc. 7-17, p. 10).  Dr. Bentley noted that Mr. Ward stopped taking Wellbutrin and Ativan.  (Doc. 7-17, pp. 10, 11).  Mr. Ward reported at a January 26, 2022 visit that he had more good days than down days and was feeling a "little bit better."  (Doc. 7-17, p. 12).  Dr. Bentley noted that Mr. Ward needed a sleep study but insurance would not cover one.  (Doc. 7-17, p. 13).  By a February 24, 2022 visit, Mr. Ward stated that he had mood swings, anger, depression "most days," irritability, suicidal ideation with no intent or plan to self-harm, "panicky feelings occasionally at work," and "maintained" attention.  (Doc. 7-17, p. 15).  Dr. Bentley increased Mr. Ward's Risperdal dosage.  (Doc. 7-17, p. 14).  On March 24, 2022, Mr. Ward reported that he was "in a hole [he could not] get out of" and was in a "real bad low."  (Doc. 7-17, p. 17).  He stated that he had no desire, motivation, or interest; did not sleep well and could not get a sleep study; and was interacting some with peers online.  (Doc.

---

[22]  The Court could not locate in the administrative record evidence that Mr. Ward obtained a lumbar spine MRI.

7-17, pp. 16, 17). Dr. Bentley increased Mr. Ward's Cymbalta dosage to 60 mg and continued his other medications. (Doc. 7-17, p. 16).

At an April 25, 2022 visit with Dr. Bentley, Mr. Ward reported that he was not doing well and had increased depression, racing thoughts, and suicidal ideation. (Doc. 7-17, p. 18, 19). Dr. Bentley increased Mr. Ward's Zoloft dosage to 300 mg and added Klonopin. (Doc. 7-17, p. 18).[23] On May 9, 2022, Mr. Ward stated he had irritability because of his inability to nap during the day, suicidal ideation with no plan or intent to self-harm, and controlled attention. (Doc. 7-17, p. 21). Mr. Ward reported that Klonopin helped "some" with his anxiety. (Doc. 7-17, p. 20). On June 8, 2022, Mr. Ward stated that he had good days and bad days, that he had had high anxiety for several days, and that he cut off a friend group that caused him stress. (Doc. 7-18, p. 3). Dr. Bentley noted that Mr. Ward had undiagnosed sleep apnea, but Mr. Ward could not obtain a sleep study test because he could not "get ins[urance] to adequately cover the testing." (Doc. 7-18, p. 3). At a July 12, 2022 visit, Mr. Ward reported that he was not doing well, did not sleep well, felt worthless, and was "alive at best." (Doc. 7-18, pp. 4, 5). He stated that he had thoughts that he was "better off dead" and had "intrusive thoughts of harming himself or others." (Doc. 7-18, pp. 4, 5). Mr. Ward indicated that Klonopin and Vistaril did not help

---

[23] Klonopin is used to treat panic disorders. *See* https://www.webmd.com/drugs/2/drug-920-6006/klonopin-oral/clonazepam-oral/details (last visited Dec. 6, 2024).

his anxiety and that Ritalin helped him focus. (Doc. 7-18, p. 5). Dr. Bentley added a prescription for Lithium. (Doc. 7-18, p, 4).[24]

On July 25, 2022, Mr. Ward told Dr. Bentley that the Lithium helped. (Doc. 7-18, p. 6). He reported that his thoughts of self-harm were "less intense," but he had increased anxiety and had had a panic attack. (Doc. 7-18, p. 7). He had more energy and slept better. (Doc. 7-18, p. 7). Dr. Bentley noted that Mr. Ward was not taking Risperdal, Cymbalta, and Zoloft because they caused dizziness and headaches. (Doc. 7-18, pp. 6, 7). Dr. Bentley continued Mr. Ward on Lithium, Klonopin, Lamictal, Vistaril, and Ritalin. (Doc. 7-18, p. 6). On August 8, 2022, Mr. Ward stated that he was stressed and anxious. (Doc. 7-18, p. 9). Mr. Ward reported that he had low energy, mood issues, and irritability but stated that his medications helped him. (Doc. 7-18, p. 9). Dr. Bentley increased Mr. Ward's Lithium dosage and continued his other medications. (Doc. 7-18, p. 8).

On August 25, 2022, Mr. Ward saw CRNP Herald and complained of muscle aches and left knee pain. (Doc. 7-16, p. 13). Mr. Ward reported that his anxiety and depression were better on Lithium. (Doc. 7-16, p. 13). CRNP Herald gave Mr. Ward Pennsaid samples for his knee pain and noted that "weight loss would benefit

---

[24] Lithium is used to treat mania associated with bipolar disorder. *See* https://www.mayoclinic.org/drugs-supplements/lithium-oral-route/description/drg-20064603 (last visited July 25, 2024).

[Mr. Ward's] joint pain." (Doc. 7-16, p. 14).[25]  Mr. Ward declined a referral to orthopedics. (Doc. 7-16, p. 14).

Mr. Ward saw Dr. Bentley on September 8, 2022 and reported that he "[felt] like [his] body [was] trying to shut down." (Doc. 7-18, p. 10).  He was weak, had no energy, and was "[t]ired mentally." (Doc. 7-18, p. 10).  Mr. Ward reported that he had stopped taking all of his medications except Lithium. (Doc. 7-18, p. 10).  Dr. Bentley discontinued Lamictal, Vistaril, Ritalin, and Klonopin and continued Mr. Ward on 300 mg of Lithium. (Doc. 7-18, p. 10).

At an October 6, 2022 visit with Dr. Bentley, Mr. Ward reported on a "Patient Health Questionnaire" that nearly every day, he felt down, depressed, hopeless, and tired; had difficulty sleeping; had little energy; felt bad about himself; and moved or spoke slowly or was fidgety or restless. (Doc. 7-18, p. 11).  Mr. Ward reported that more than half the time, he had trouble concentrating and had a poor appetite or overate. (Doc. 7-18, p. 11).  Mr. Ward indicated that these symptoms made it extremely difficult for him to work, take care of things at home, or get along with people. (Doc. 7-18, p. 11).  Mr. Ward reported that he had been unmedicated for two weeks and felt dizzy and nauseated. (Doc. 7-18, p. 12).  He had the suicidal ideation of "[b]lowing the back of [his] head out with a shotgun" and stated that all

---

[25]  Pennsaid is used to treat the pain of osteoarthritis of the knees.  *See* https://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=802cd382-443d-48e3-9c9d-fd946c73c79f (last visited Dec. 6, 2024).

the progress he had made had "gone up in smoke." (Doc. 7-18, p. 12). Dr. Bentley discontinued Lithium because of its side effects and prescribed Prozac and Lybalvi. (Doc. 7-18, p. 12).[26]  Mr. Ward reported at an October 13, 2022 visit that Lybalvi caused dizziness and that he had "little change in his mood and depression." (Doc. 7-18, p. 13). Dr. Bentley discontinued Lybalvi, increased the Prozac dosage, and prescribed Adderall and Vraylar. (Doc. 7-18, p. 13).[27]

On November 14, 2022, Dr. Bentley noted that Mr. Ward was "[b]ack where things [had] flattened out." (Doc. 7-18, p. 14). Mr. Ward stated that he fell off his porch and hurt his tailbone and had more pain in his back. (Doc. 7-18, p. 14). At a December 13, 2022 visit, Mr. Ward reported that he had a dysregulated mood and poor energy, slept all the time, and had back and joint pain. (Doc. 7-18, p. 15). Mr. Ward indicated on a questionnaire that his bipolar disorder symptoms made it very difficult for him to work, take care of things at home, and get along with people. (Doc. 7-18, pp. 16-17). Dr. Bentley noted that Mr. Ward had a depressed and

---

[26]  Prozac is used to treat major depressive disorder, obsessive-compulsive disorder, and panic disorder.  *See* https://www.drugs.com/prozac.html (last visited Dec. 6, 2024).

Lybalvi "is used to treat certain mental/mood disorders (such as schizophrenia [and] bipolar disorder)."  *See*  https://www.webmd.com/drugs/2/drug-181659/lybalvi-oral/details (last visited Dec. 6, 2024).

[27]  Adderall "is used to treat attentional deficit hyperactivity disorder" and helps with focus and attention.  *See*  https://www.webmd.com/drugs/2/drug-63163/adderall-oral/details (last visited Dec. 6, 2024).

irritable mood and had "not responded well to various medications." (Doc. 7-18, p. 15).

Dr. Bentley wrote a letter "To Whom It May Concern" dated February 9, 2023, in which he noted that he was treating Mr. Ward for major depressive disorder and generalized anxiety disorder and that Mr. Ward was compliant with treatment. (Doc. 7-18, p. 18). Dr. Bentley stated that "[d]espite aggressive treatment and multiple medication changes, there ha[d] been minimal to no improvement in [Mr. Ward's] condition." (Doc. 7-18, p. 18). Dr. Bentley wrote that Mr. Ward "remain[ed] unable to work." (Doc. 7-18, p. 18).

### *Dr. Estock's Consultative Assessments*

On July 15, 2020, at the request of the Social Security Administration, Dr. Robert Estock reviewed Mr. Ward's medical records to evaluate Mr. Ward's mental residual functional capacity. (Doc. 7-4, pp. 8-12). Dr. Estock opined that Mr. Ward was not significantly limited in his ability to remember work locations and work-like procedures; remember and carry out short and simple instructions; maintain attention and concentration for extended periods; adhere to a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without supervision; make simple work-related decisions; complete a normal workday at a consistent pace; ask simple questions; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; and travel to unfamiliar places. (Doc. 7-4, pp.

11-12).  Dr. Estock opined that Mr. Ward was moderately limited his ability to remember and carry out detailed instructions; work in coordination with or in proximity to others without distraction; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (Doc. 7-4, pp. 11-12).

Dr. Estock opined that Mr. Ward could tolerate ordinary work pressures but should avoid quick decision making, rapid changes, and multiple demands; would benefit from regular rest breaks and a slowed pace but would "still be able to maintain a work pace consistent with the mental demands of competitive level work;" and should have casual and infrequent contact with public, supportive feedback from supervisors, and infrequent, well-explained changes.  (Doc. 7-4, pp 11-12).

Dr. Estock evaluated Mr. Ward's records again on February 4, 2021 and listed the same limitations he assigned Mr. Ward in 2020.  (Doc. 7-4, pp. 33-38).

### *Mr. Ward's Function Report*

On June 13, 2020, at the request of the Social Security Administration, Mr. Ward completed a function report.  (Doc. 7-8, pp. 21-28).  Mr. Ward indicated that he lived alone.  (Doc. 7-8, p. 21).  He stated that each day, he showered; ate breakfast,

lunch, and dinner; watched television, YouTube, or Anime; and played video games. (Doc. 7-8, p. 21).  Mr. Ward stated that fed his pets in the morning and the evening and bathed them as needed.  (Doc. 7-8, p. 22).  He indicated that he prepared simple meals; did dishes, laundry, and yardwork; and took out the trash.  (Doc. 7-8, pp. 22-23).  He set a reminder on his phone to take his medications.  (Doc. 7-8, p. 23).  Mr. Ward stated that he shopped for himself and managed his funds.  (Doc. 7-8, p. 24).

Mr. Ward indicated that he woke up "frequently throughout the night crying or extremely anxious."  (Doc. 7-8, p. 22).  He stated that he struggled when working around a lot of people, became "overly anxious in social settings" unless he was with someone he trusted, and was "always looking over [his] shoulders."  (Doc. 7-8, pp. 24, 26).  Mr. Ward indicated that his mental impairments affected his memory and ability to complete tasks, concentrate, understand, follow instructions, and get along with others.  (Doc. 7-8, p. 26).  He had difficulty paying attention, could not follow spoken instructions, and could follow written instructions "fairly well."  (Doc. 7-8, p. 26).  Mr. Ward indicated that he did not get along with authority figures or handle changes in routine.  (Doc. 7-8, pp. 26-27).  He stated that he had been fired or laid off from Discount Home Center because his co-workers and boss "push[ed] [him] to his breaking point."  (Doc. 7-8, p. 27).  Mr. Ward indicated that his family was "very toxic and like[d] to push [him] to [his] breaking point a lot."  (Doc. 7-8, p. 26).

Mr. Ward did not indicate that his impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, or use his hands. (Doc. 7-8, p. 26).

### Mr. Ward's Mother's Third-Party Function Report

On June 15, 2020, Mr. Ward's mother, Kelly Ward, completed a third-party function report. (Doc. 7-8, pp. 30-37). Ms. Ward reported that Mr. Ward had the limitations included in Mr. Ward's function report. Ms. Ward stated that she spent four to five hours a day with Mr. Ward. (Doc. 7-8, p. 30). Ms. Ward indicated that Mr. Ward sometimes needed a reminder to bathe and change clothes. (Doc. 7-8, p. 31). Ms. Ward stated that Mr. Ward could pay bills, count change, handle a savings account, and use a checkbook. (Doc. 7-8, p. 33). She reported that Mr. Ward was "easily frustrated playing video games." (Doc. 7-8, p. 34).

Ms. Ward reported that Mr. Ward "was more social in school," did not do well in crowds, and was "not confident as an adult to do simple jobs and tasks." (Doc. 7-8, pp. 31, 35). Ms. Ward indicated that Mr. Ward became "anxious and nervous" in traffic or in a crowded store. (Doc. 7-8, pp. 33, 35). She stated that Mr. Ward felt like everyone judged him. (Doc. 7-8, p. 35). Ms. Ward indicated that Mr. Ward could not complete tasks because he overthought things, wanted to do things his way, and did not work well with others. (Doc. 7-8, p. 35). Ms. Ward stated that Mr. Ward could pay attention for 15 minutes at most, could follow written instructions

well, could not follow spoken instructions, and did not get along with authority figures. (Doc. 7-8, pp. 35-36). She stated that Mr. Ward was insecure and struggled with anger issues. (Doc. 7-8, p. 37). Ms. Ward indicated that Mr. Ward had struggled with ADHD throughout his academic career. (Doc. 7-8, p. 37). She stated that Mr. Ward "talk[ed] about killing himself or wanting to die" and that he hurt himself by hitting walls with his hands. (Doc. 7-8, p. 37).

### *Mr. Ward's First Administrative Hearing*

Mr. Ward attended a telephone administrative hearing with an ALJ on November 1, 2021. Mr. Ward testified that he was 24 years old, weighed 505 pounds, and lived in an apartment behind his parents' house. (Doc. 7-3, pp. 64, 69, 74). His indicated that his parents bought his groceries and paid his water and power bills. (Doc. 7-3, p. 74). He graduated from high school and had some HVAC training in junior college but did not complete the program because he could not "handle the stress." (Doc. 7-3, pp. 64-65). Mr. Ward testified that he drove infrequently because he had to have a parent or trusted family member or friend with him in the vehicle when he drove. (Doc. 7-3, p. 66).

Mr. Ward indicated that he stayed in his apartment most of the time and played video games because that activity was "the only thing that really help[ed] [him] kind of cope with [his] issues." (Doc. 7-3, pp. 66, 72). In the video games, he could "control the work," "control [his] character," and "make decisions in [his]

31

advantage." (Doc. 7-3, pp. 66, 70). He stated that he tried to limit his video games to two-hour sessions because his eyes hurt after playing for longer periods of time. (Doc. 7-3, p. 72). Mr. Ward testified that he usually played video games by himself and sometimes played with a group of people online "for a couple hours on a Saturday night." (Doc. 7-3, p. 72). He stated that he sometimes talked with a group on a "content creation panel" and watched gaming videos on YouTube. (Doc. 7-3, p. 73).

Mr. Ward stated that when he was young, his family did not support him because they thought that he was "acting out" and that his issues were "in [his] head." (Doc. 7-3, pp. 66-67). He testified that he his parents offered more support after he began seeing Dr. Bentley because his parents then understood that "there was actually something wrong." (Doc. 7-3, p. 67).

Mr. Ward stated that he suffered from severe anxiety, depression, suicidal thoughts, and ADHD and that these issues caused him significant trouble in the workplace. (Doc. 7-3, pp. 68-70). He added that his psychiatrist, Dr. Bentley, prescribed Risperdal, Zoloft, Ritalin, Wellbutrin, and Ativan. (Doc. 7-3, p. 68). Mr. Ward stated that his medications helped control his thoughts "a little bit quicker" but were "more like a Band-Aid than anything." (Doc. 7-3, p. 69). Mr. Ward testified that he had attempted suicide several times and that his last suicide attempt was "[a]round this time last year." (Doc. 7-3, p. 68). He indicated that he had suicidal

thoughts daily, and his medications helped "pull [him] away from those thoughts." (Doc. 7-3, p. 68).

Mr. Ward testified that he had difficulty in large groups of people and was "overly anxious" when he was around 15 or 20 people at functions. (Doc. 7-3, pp. 69-70). Mr. Ward testified that he tried to work as a floor salesperson in a furniture store for but was overly anxious trying to speak to customers and "had issues with [his] employers." (Doc. 7-3, p. 65). Mr. Ward stated that after working at the store less than one month, he and his manager agreed that Mr. Ward should leave the job. (Doc. 7-3, p. 65). Mr. Ward indicated that he had a job changing oil, but he stayed at that job one week because it was "overly stressful." (Doc. 7-3, pp. 65-66). He testified that he was paranoid, had panic attacks, and thought that people were watching and judging him and talking about him behind his back. (Doc. 7-3, p. 71). He testified that his monthly visits with Dr. Bentley helped because he could vent and get things off of his chest. (Doc. 7-3, p. 71).

Mr. Ward testified that his weight caused pain in his ankles, knees, and back when he overexerted himself. (Doc. 7-3, p. 64). Mr. Ward indicated that he had sleep apnea. (Doc. 7-3, pp. 67-68). He stated that "usually [got] the recommended" eight hours of sleep but would wake up about 30 minutes to an hour before he had to get up because he had a dream or had to go to the bathroom. (Doc. 7-3, p. 72). Mr. Ward testified that he suffered from migraine headaches almost daily. (Doc. 7-

3, pp. 67-68). Mr. Ward rated the severity and intensity of the migraines as a 10/10 at worst and a 5/10 to 6/10 on average. He stated that during an "extreme migraine," he was sensitive to light and sound and had to "turn off everything." (Doc. 7-3, pp. 67-68).

Mr. Ward's mother, Kelly Ward, testified that Mr. Ward took care of his personal hygiene but needed a reminder. (Doc. 7-3, p. 78). She indicated that Mr. Ward's anger, rage, anxiety, and paranoia made it difficult for him to work. (Doc. 7-3, p. 78). Ms. Ward indicated that they "put [Mr. Ward] in a building out by himself" because his rage affected their "home life" and younger child. (Doc. 7-3, p. 80). She added that she and her husband kept their guns locked up because Mr. Ward had suicidal thoughts. (Doc. 7-3, p. 80). Ms. Ward stated that Mr. Ward's visits with Dr. Bentley helped, but Mr. Ward's medications were not stabilized. (Doc. 7-3, p. 80).

Ms. Norma Stricklin testified as a vocational expert at Mr. Ward's administrative hearing. (Doc. 7-3, p. 82). The ALJ noted that Mr. Ward had no past relevant work. (Doc. 7-3, p. 82). The ALJ asked Ms. Stricklin to consider the work available to an individual with the same age and education as Mr. Ward who could perform medium work with the following limitations:

> [the] individual would be limited to understanding, remembering, and carrying out simple instructions with infrequent -- that would be less than occasional -- changes in the work setting such that the duties of the job could be learned and mastered in 30 days or less. The

> individual could handle occasional decision making in the work
> setting[] and [could] have infrequent . . . interaction with the public
> such that public contact [was] not required by the duties of the job.

(Doc. 7-3, p. 82). Ms. Stricklin testified that an individual could perform medium,

unskilled work as an industrial cleaner with 50,000 available jobs nationally; a day

worker with 70,000 available jobs nationally; and an assembler, with 80,000

available jobs nationally. (Doc. 7-3, p. 82).

In the ALJ's second hypothetical, he asked Ms. Stricklin to assume the

limitations in the first hypothetical with the added limitation that the individual

required additional supervision, with hourly check-ins to ensure that he performed

the job correctly. (Doc. 7-3, pp. 82-83). Ms. Stricklin stated that the additional

limitation would preclude all work. Next, the ALJ asked Ms. Stricklin to take away

the supervision limitation and assume that the same individual would be limited to

infrequent or less than occasional interaction with the public, coworkers, and

supervisors. (Doc. 7-3, p. 83). Ms. Stricklin testified that such a limitation would

preclude all work. (Doc. 7-3, p. 83). Ms. Stricklin stated that employers tolerated

no more than 15% off task behavior and no more than one absence each month.

(Doc. 7-3, p. 84). Ms. Stricklin testified that her opinions about the supervision and

interaction limitations, off-task behavior, and absenteeism were based on her

education and work experience and not on the Dictionary of Occupational Titles and

accompanying publications. (Doc. 7-3, pp. 83-85).

## *Mr. Ward's Second Administrative Hearing*

The ALJ held a second telephone hearing on February 13, 2023. (Doc. 7-3, p. 38). Mr. Ward testified that he was twenty-five years old and weighed 550 pounds. (Doc. 7-3, p. 43). He stated that he lived alone behind his parent's trailer in a "shed" that his parents "converted to a living space." (Doc. 7-3, p. 46). Mr. Ward indicated that he "quite often" distanced himself from his family and friends, did not socialize with anyone, and liked being alone. (Doc. 7-3, p. 46).

Mr. Ward stated that he was less mobile than he was at his first administrative hearing, and pain in his legs, left knee, and left elbow had increased. (Doc. 7-3, pp. 44, 47, 51). Mr. Ward indicated that he could not put weight on his left knee and that he was "in the process of treatment" for his leg and knee pain. (Doc. 7-3, pp. 44, 51). Mr. Ward testified that he had headaches three or four times each week. (Doc. 7-3, p. 45). He testified that he had to sleep to alleviate his migraines, and he regularly had headache pain. (Doc. 7-3, p. 45).

Mr. Ward testified that his anxiety and depression were worse and that he was diagnosed with bipolar and panic disorder. (Doc. 7-3, p. 45). He stated that he felt guilty and worthless, had decreased energy, and thought his family and others were out to get him. (Doc. 7-3, pp. 47-48). Mr. Ward testified that he had suicidal and homicidal thoughts, but he had not acted on them. (Doc. 7-3, p. 47). On a typical day, he slept to "try to keep [his] mind off bad thoughts." (Doc. 7-3, p. 48). Mr.

Ward indicated that he had about four "bad days" a week. On those days, he mainly slept. (Doc. 7-3, p. 49). He testified that he did not want to be around crowds, needed someone with him if he went anywhere, was not comfortable driving, and could pay attention for only five minutes. (Doc. 7-3, p. 49). He stated that he took Vraylar, Prozac, and Adderall and could not tell if the medications helped. (Doc. 7-3, pp. 46, 50).

Mr. Christopher Riban testified as a vocational expert at Mr. Ward's second administrative hearing. (Doc. 7-3, p. 52). The ALJ asked Mr. Riban to consider the work available to an individual with the same age and education as Mr. Ward who could perform medium work with the following limitations:

> [the individual could] understand, remember, and carry out simple instructions with infrequent changes in the work setting such that the duties of the job [could] be learned and mastered in 30 days or less. He [could] handle occasional decision-making in the work setting. And he [could] have infrequent interaction with the public such that is not required by the duties of the job.

(Doc. 7-3, p. 52). Mr. Riban testified that an individual with those limitations could perform medium, unskilled work as an automobile assembler with 542,000 available jobs nationally; a produce packer with 941,000 available jobs nationally; and a machine feeder with 225,000 available jobs nationally. (Doc. 7-3, pp. 52-53).

The ALJ asked Mr. Riban to assume that the individual could perform light work with the same limitations. (Doc. 7-3, p. 53). Mr. Riban testified that the individual could perform light, unskilled work as a small parts assembler I with

467,000 available nationally; a routing clerk with 804,000 available jobs nationally; and a final inspector with 163,800 available jobs nationally. (Doc. 7-3, pp. 53-54). Mr. Riban testified that an individual who was off-task more than 15 percent of a workday and absent from work two or more times per month consistently would be precluded from all work. (Doc. 7-3, p. 54).

### THE ALJ'S DECISION

On April 5, 2023, the ALJ issued an unfavorable decision. (Doc. 7-3, pp. 18-29). The ALJ found that Mr. Ward had not engaged in substantial gainful employment since March 17, 2020. (Doc. 7-3, p. 20). The ALJ determined that Mr. Ward suffered from the severe impairments of morbid obesity, depression, obsessive compulsive disorder, attention deficit disorder, and generalized anxiety disorder. (Doc. 7-3, p. 20). The ALJ found that Mr. Ward's Chiari malformations, low testosterone, and migraines were non-severe impairments, and his sleep apnea was not a medically determinable impairment. (Doc. 7-3, p. 21). Based on a review of the medical evidence, the ALJ concluded that Mr. Ward did not have an impairment or a combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 7-3, p. 22).

Considering Mr. Ward's impairments, the ALJ evaluated Mr. Ward's residual functional capacity. (Doc. 7-3, p. 23). The ALJ determined that Mr. Ward had the RFC to perform:

medium work . . . except [he could] understand, remember, and carry out simple instructions with infrequent changes in the work setting such that the duties of the job [could] be mastered in thirty days or less. [He could] handle occasional decision making in the work setting. [He could] have infrequent interaction with the pubic such that it was not required by the duties of the job.

(Doc. 7-3, pp. 23-24).[28]

Based on this RFC and relying on the testimony from the vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Mr. Ward could perform, including produce packer, machine feeder, automobile assembler, routing clerk, final inspector, and small parts assembler. (Doc. 7-3, p 28). Accordingly, the ALJ determined that Mr. Ward was not disabled as defined by the Social Security Act. (Doc. 7-3, p. 29).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court reviews the ALJ's "'factual findings with deference'" and his "'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. *See* 42 U.S.C. § 405(g). "The phrase

---

[28] The ALJ determined that Mr. Ward had the same RFC in the first unfavorable decision. (Doc. 7-4, p. 48).

'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding.  Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019) (quoting *T-Mobile South*, *LLC* v. *Roswell*, 574 U.S. 293, 301 (2015), and *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (emphasis omitted).  Substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 587 U.S. at 103 (quoting *Consolidated Edison Co.*, 305 U.S. at 229); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (same).  When evaluating an administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citations omitted).  If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158-59); *see also Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2015) (same).

With respect to an ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. That review is *de novo*. *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002). If a district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Mr. Ward argues that substantial evidence does not support the ALJ's reasons for discrediting his subjective statements regarding the limiting effects of his mental impairments. (Doc. 11). The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *see also Coley v. Comm'r of Soc. Sec.*, 771 Fed. Appx. 913, 917 (11th Cir. 2019). When relying upon evidence of pain or other subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002)

(citing *Holt*, 921 F.2d at 1223). If an ALJ does not properly apply the three-part standard, reversal is appropriate. *McLain v. Comm'r of Soc. Sec.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r of Soc. Sec.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225. The Commissioner must accept the claimant's testimony as a matter of law if the ALJ inadequately discredits the testimony. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r of Soc. Sec.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*).

When a claimant relies on his testimony to establish a disability impairment, the provisions of Social Security Regulation 16-3p apply. SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and

42

other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2017 WL 5180304, at *4.  Concerning the ALJ's burden to explain the

reasons for discrediting a claimant's subjective symptoms, SSR 16-3p states:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough . . .  simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2017 WL 5180304, at *10.   In evaluating a claimant's reported

symptoms, an ALJ must consider:

(i)   [the claimant's] daily activities;

(ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) [p]recipitating and aggravating factors;

(iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

(v)  [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi) [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of Soc. Sec.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

In applying the pain standard, the ALJ discussed Dr. Bentley's treatment records and Dr. Estock's administrative assessment, (Doc. 7-3, pp. 25-26); Mr. Ward's hearing testimony and function report, (Doc. 7-3, pp. 24-25); and the third-party function report Mr. Ward's mother provided, (Doc. 7-3, p. 26). The ALJ found that Mr. Ward's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but the ALJ determined that Mr. Ward's statements concerning the intensity, persistence, and limiting effects of his symptoms were not "entirely consistent with the medical evidence and other evidence in the record." (Doc. 7-3, p. 25). The ALJ found that Mr. Ward's allegations of disabling symptoms were "inconsistent because they [were] not supported by the objective medical evidence." (Doc. 7-3, p. 25). The ALJ concluded that the objective medical evidence showed that Mr. Ward had no more than "moderate functional limitations" from his mental impairments. (Doc. 7-3, p. 26).

With respect to Mr. Ward's treatment records with Dr. Bentley, the ALJ found that "[o]verall, Dr. Bentley's treatment notes indicate[d] improvement in [Mr. Ward's] symptoms." (Doc. 7-3, p. 25). The ALJ noted that Mr. Ward reported to Dr. Bentley that his medications were helpful; that he felt less dread; and that he had

"greater motivation to get out and do things, . . . improved mood, better energy, less anger outbursts, less impulsivity, greater insight, and better ability to focus." (Doc. 7-3, p. 25).

Mr. Ward argues that the ALJ improperly discounted Dr. Bentley's medical opinion that Mr. Ward had disabling mental symptoms that affected his ability to work. (Doc. 11, p. 17). An ALJ must consider five factors when evaluating the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and "other factors." 20 C.F.R. § 416.920c(1)-(5). The most important factors are supportability and consistency, and an ALJ must "explain how he considered the supportability and consistency factors for a medical source's medical opinions . . . in his determination or decision." 20 C.F.R. § 416.920c(b)(2).[29]

In discounting Dr. Bentley's medical opinion, the ALJ focused on Mr. Ward's improvement in his mental symptoms in early 2020 and again in July 2022 after Dr. Bentley prescribed Lithium. (Doc. 7-3, pp. 25-26). The ALJ wrote that Mr. Ward had "up and down symptoms" but that a "change in medication to Lithium, helped stabilize" Mr. Ward's symptoms. The ALJ omitted from his analysis the many times

---

[29] An ALJ does not have to articulate how he considered the other three factors. 20 C.F.R. § 416.920c(b)(2) ("We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section . . . when we articulate how we consider medical opinions . . . in your case record.").

between February 2020 and December 2022 that Dr. Bentley increased Mr. Ward's medication dosages or changed medications to address Mr. Ward's deteriorating mental symptoms.

The ALJ correctly noted that Mr. Ward reported some improvement in his mental symptoms after Dr. Bentley increased Mr. Ward's Zoloft dosage in March 2020, (Doc. 7-11, pp. 75-76), but by June 2020, Dr. Bentley noted that Mr. Ward had a constricted affect and anxious mood, and Dr. Bentley increased Mr. Ward's Zoloft prescription again.  (Doc. 7-11, p. 79).  Dr. Bentley added a prescription for Buspar on July 1, 2020 for Mr. Ward's fluctuating mood and increased the Buspar dosage and added a prescription for Vraylar in July 2020.  (Doc. 7-11, p. 80; Doc. 7-12, p. 40).  In August 2020, Mr. Ward reported a mental breakdown and suicidal ideations because he could not handle stress, and Dr. Bentley increased the Vraylar dosage and prescribed Lamictal, which seemed to temporarily help Mr. Ward's symptoms.  (Doc. 7-12, pp. 41-42).  By October 2020, Mr. Ward reported bad days, frustration, and crying spells, and Dr. Bentley discontinued Vraylar and prescribed Abilify.  (Doc. 7-12, p. 45).  Mr. Ward reported in December 2020 that Lamictal helped control his anger and impulsivity, but he continued to have anger and crying spells, anxiety during the day, and trouble sleeping.  (Doc. 7-12, p. 51).  Dr. Bentley increased the Abilify dosage and prescribed Vistaril. (Doc. 7-12, p. 51).

Mr. Ward reported increased anxiety and agitation in January 2021, and Dr. Bentley prescribed Ritalin. (Doc. 7-12, p. 52). Mr. Ward had a disheveled appearance in February 2021 and reported rough days, anger outbursts, and hyper focusing in March 2021. (Doc. 7-12, p. 53; Doc. 7-15, p. 3). Dr. Bentley increased the Ritalin dosage. (Doc. 7-15, p. 3). In April 2021, Mr. Ward reported increased irritability, anxiety, self-isolation, and stress, and Dr. Bentley added a morning dosage of Abilify. (Doc. 7-15, p. 9). In May 2021, Mr. Ward indicated that he was not as depressed and had more manageable anger, but he reported manic episodes with irritability and anger outbursts. (Doc. 7-15, p. 11). Dr. Bentley increased the Abilify dosage. (Doc. 7-15, p. 11). In June 2021, Mr. Ward reported disruptive anger outbursts, agitation, and anxiety, and Dr. Bentley assessed "moderate to severe" bipolar disorder, discontinued Buspar and Vistaril, and prescribed Ativan and Wellbutrin. (Doc. 7-15, p. 14). Mr. Ward noted some improvement in June 2021, but by July and August 2021, Mr. Ward's bipolar symptoms had worsened, and Dr. Bentley increased the Wellbutrin dosage, discontinued Abilify, and added a prescription of Geodon. (Doc. 7-15, pp. 17, 19). Because Geodon caused Mr. Ward to have more frequent headaches, Dr. Bentley substituted Risperdal in September 2021. (Doc. 7-15, pp. 21-22). Mr. Ward reported doing "fairly well" in November 2021, but he continued to report suicidal ideations. (Doc. 7-17, pp. 7-8).

In early 2022, Mr. Ward's bipolar symptoms continued to wax and wane, and Dr. Bentley continued to adjust Mr. Ward's medications. (Doc. 7-17, pp. 10-15). By March 2022, Mr. Ward reported he was severely depressed, and in April 2022, he reported increased depression, racing thoughts, and suicidal ideation; Dr. Bentley increased the Zoloft and Cymbalta dosages and added a prescription for Klonopin. (Doc. 7-17, pp. 16-19). Mr. Ward reported that Klonopin helped his anxiety "some," but he continued to have good and bad days. (Doc. 7-17, p. 20; Doc. 7-18, p. 3). By July 2022, Mr. Ward had "intrusive thoughts of harming himself and others" and reported that Klonopin and Vistaril did not help his anxiety; Dr. Bentley added a prescription for Lithium. (Doc. 7-18, pp, 4-5). Mr. Ward reported in June 2022 that Lithium made his thoughts of self-harm "less intense," but he continued to have increased anxiety and panic attacks. (Doc. 7-18, pp. 6-7). In August 2022, Mr. Ward reported a fluctuating mood and increased irritability, and Dr. Bentley increased the Lithium dosage. (Doc. 7-18, pp. 8-9). In October 2022, Mr. Ward reported an increase in bipolar symptoms and side effects from Lithium; Dr. Bentley discontinued Lithium and prescribed Prozac and Lybalvi. (Doc. 7-18, pp. 11-12). Dr. Bentley discontinued Lybalvi because it made Mr. Ward dizzy. Dr. Bentley increased Mr. Ward's Prozac dosage and prescribed Adderall and Vraylar. (Doc. 7-18, p. 13). Dr. Bentley noted that Mr. Ward's symptoms "flattened out" in November 2022, but by December 2022, Dr. Bentley noted that Mr. Ward had a

depressed and irritable mood and that Mr. Ward had "not responded well to various medications." (Doc. 7-18, p. 15).

A comprehensive review of Dr. Bentley's treatment of Mr. Ward provides important context. In finding that Mr. Ward's mental symptoms improved overall between February 2020 and March 2023, the ALJ focused on the times in three years that Mr. Ward reported some improvement in his mental symptoms. The ALJ overlooked records that evidence Dr. Bentley's consistent adjustment of Mr. Ward's treatment to address Mr. Ward's deteriorating symptoms, both before and after Dr. Bentley prescribed Lithium. An ALJ cannot cherry-pick evidence in an applicant's medical records to support a conclusion. *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986*)* ("It is not enough to discover a piece of evidence which supports [a] decision, but to disregard other contrary evidence[,]" and a decision is not supported where it was reached "by focusing upon one aspect of the evidence and ignoring other parts of the record"). The Commissioner cites *Garland v. Dai*, 593 U.S 357, 365 (2021), and *Borges v. Comm'r of Soc. Sec.*, 771 Fed. Appx. 878, 882 (11th Cir. 2019), for the proposition that the Court should not reweigh the evidence and substitute its judgment for that of the ALJ. (Doc. 14, pp. 16-17).[30] Here, the

---

[30] *Garland* is inapposite because it involved the standard for judicial review under the Immigration and Nationalization Act pursuant to 8 U.S.C. § 1252(b)(4)(B), not the standard for judicial review of a Social Security appeal pursuant to 42 U.S.C. § 405(g). *Garland*, 593 U.S. at 365. The Supreme Court in *Garland* held that the Ninth Circuit's "deemed true-or-credible rule," which provided that a reviewing court must treat a noncitizen's testimony as credible in the absence of an explicit adverse credibility determination by an immigration judge or Board of Immigration

Court does not simply point to some evidence in the record that undermines the ALJ's decision or substitute its own judgment for that of the ALJ; instead, the Court finds that the ALJ has not "articulate[d] explicit and adequate reasons" for rejecting Mr. Ward's subjective testimony because the ALJ has selectively focused on one aspect of the evidence and ignored other substantial evidence. *Wilson*, 284 F.3d at 1225; *McCruter*, 791 F.2d at 1548.

Moreover, the ALJ had to consider the type, dosage, effectiveness, and side effects of Mr. Ward's medications in evaluating Mr. Ward's reported symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ did not discuss the numerous medication changes and side-effects discussed above. The only medication the ALJ mentioned in his opinion was Lithium, and the ALJ did not include a complete picture of the effectiveness of Lithium in treating Mr. Ward's bipolar symptoms. Again, the ALJ has not properly articulated explicit and adequate reasons for rejecting Mr. Ward's subjective testimony or Dr. Bentley's medical opinions regarding the severity of Mr. Ward's mental limitations.

---

Appeals, did not apply to judicial review of the BIA's decision that the noncitizen was ineligible for relief from removal. *Garland*, 593 U.S. at 365.

In *Borges*, the Eleventh Circuit affirmed the district court's finding that substantial evidence supported the ALJ's RFC assessment. *Borges*, 771 Fed. Appx. at 883. The Eleventh Circuit stated that a district court's limited scope of review "preclude[d] it from re-weighing the evidence or substituting its own judgment for that of the Commissioner" if substantial evidence supported the ALJ's decision, even though there might be some evidence in the record that undermined the ALJ's finding. *Borges*, 771 Fed. Appx. at 884. As noted, here the ALJ overlooked swaths of medical evidence relevant to his decision. That is grounds to vacate the Commissioner's decision.

To support his finding that Dr. Bentley's opinions were unpersuasive, the ALJ pointed to Dr. Bentley's treatment records that showed that Mr. Ward was "oriented to person, place, and time, and that he had adequate insight, logical thoughts, satisfactory attention span, undisturbed memory, and precise speech." (Doc. 7-3, p. 25). These mental status findings were not inconsistent with Dr. Bentley's opinion that Mr. Ward suffered from severe bipolar symptoms, including depression, anxiety, irritability, anger outbursts, and suicidal ideations despite numerous medical adjustments and monthly treatment. The ALJ did not explain how Dr. Bentley's treatment records from February 2020 to February 2023 and these mental status findings were inconsistent with Dr. Bentley's medical opinion that Mr. Ward's mental limitations severely affected his ability to adapt to stressful circumstances in a work setting without decompensation, behave in an emotionally stable manner, and relate predictably in social settings. *See Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1262 (11th Cir. 2019) (stating that an ALJ must identify a genuine inconsistency between a doctor's treatment notes and his medical opinion and finding that "[i]t is not enough merely to point to positive or neutral observations that create, at most, a trivial and indirect tension with the . . . physicians' opinion by proving no more than that the claimant's impairments are not all-encompassing"). The fact that Mr. Ward was oriented, had adequate insight, logical thoughts, and a good memory during mental health visits "tells us very little 'about his ability to

function in a stressful work setting.'" *See Smith v. Comm'r of Soc. Sec.*, 5:21-cv-00551-PRL, 2024 WL 963725, *5 (11th Cir. 2024) (quoting *Schink*, 935 F.3d at 1266). The ALJ did not mention Mr. Ward's testimony that he could not complete HVAC training because of anxiety. (Doc. 7-3, pp. 64-65). The ALJ did not discuss Mr. Ward's testimony that he tried to work as a floor salesperson in a furniture store and at an oil change business but could not handle the pressures of the job because of his mental symptoms. (*See* Doc. 7-3, pp. 65-66). The ALJ did not include in his analysis Mr. Ward's report that he was fired from Discount Home Center because he could not get along with his co-workers or boss. (*See* Doc. 7-8, p. 27).

The ALJ found that Mr. Ward had moderate limitations in his ability to interact with others in a work setting. (Doc. 7-3, p. 22). The ALJ noted that Mr. Ward alleged that he had difficulty in his ability to engage in social activities, get along with others, and deal appropriately with authority, (Doc. 7-3, p. 22), but the ALJ noted that Mr. Ward could "shop and spend time with friends and family" and that Mr. Ward had "good rapport" with his doctors. Mr. Ward's ability to shop occasionally does not negate his reported inability to respond appropriately to co-workers and supervisors in the work setting because of his bipolar symptoms. The Court could not find evidence in the record that Mr. Ward consistently got along with his family or spent time in person with friends; Mr. Ward testified that he did not socialize with anyone and often distanced himself from others, (Doc. 7-3, p. 46).

And Mr. Ward's good rapport with his psychiatrist and other medical providers does not indicate that he could sustain work pressures involving co-workers or supervisors. "'[T]he ability to complete tasks in settings that are less demanding than a typical work setting does not necessarily demonstrate an applicant's ability to complete tasks in the context of regular employment during a normal workday or work week.'" *Smith*, 2024 WL 963725 at *5 (quoting *Schink*, 935 F.3d at 1266).

To support his finding that Mr. Ward had only moderate mental limitations, the ALJ relied on Dr. Estock's July 2020 and February 2021 review of Mr. Ward's medical records and administrative assessments. (Doc. 7-3, p. 26). There are several relevant records that post-date Dr. Estock's assessments. Dr. Estock did not consider Dr. Bentley's treatment of Mr. Ward for most of 2021 and all of 2022. Dr. Bentley's extensive treatment records from 2020 through 2023 evidence Mr. Ward's limited ability to adapt to stressful situations at work without mental deterioration, to behave in an emotionally stable manner, and to relate predictably in social settings. Despite Dr. Bentley's consistent treatment for three years, Mr. Ward had "little to no improvement." Substantial evidence does not support the ALJ's pain standard findings regarding Mr. Ward's mental limitations.[31]

---

[31] The Court notes that the ALJ found that Mr. Ward's sleep apnea was not a medically determinable impairment because the record does include a sleep apnea diagnosis. (Doc. 7-3, p. 21). The ALJ noted that Mr. Ward did not obtain a sleep study as recommended. (Doc. 7-3, p. 21). The ALJ did not address Mr. Ward's reports to medical providers that he could not afford a sleep study because insurance would not cover the study. (*See* Doc. 7-16, pp. 16, 19; Doc. 7-17, p. 13; Doc. 7-18, p. 3); *see also* SSR 16-3p (stating that the ALJ "will not find an individual's

## CONCLUSION

For the reasons discussed above, the Court reverses the decision of the Commissioner and remands this case for further proceedings consistent with this opinion.

**DONE** and **ORDERED** this January 27, 2025.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

symptoms inconsistent with the evidence in the record" for failure to seek medical treatment "without considering possible reasons" for his failure to seek treatment, including "that the individual may not be able to afford treatment and may not have access to free or low-cost medical services").